UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) CASE NO.: 1:22-CR-9-HAB |
| | ) |
| ZACHARY D. BARNES | ) |

**OPINION AND ORDER**

Zachary Barnes ("Barnes") and his cohorts, Marquese Neal ("Neal") and Jordan Patterson ("Patterson") were charged in a nine-count indictment with various drug and firearm offenses. Barnes pleaded guilty to Count 1 of that indictment, conspiracy to distribute and possess with intent to distribute methamphetamine, in violation of 21 U.S.C. §846. The Government, in turn, moved to dismiss the remaining counts. (ECF No. 101)[1]. Thereafter, the probation office prepared a draft Presentence Investigation Report (Draft PSR, ECF No. 114). Barnes objected to the inclusion of a two-level enhancement under USSG §3B1.1(c) (leader/organizer enhancement) and to the Draft PSR's failure to consider Barnes "safety valve" eligible pursuant to §5C1.2(a). (ECF No. 117). After considering the objections, the probation office submitted a Final PSR along with an Addendum that made no revisions to the draft. (ECF Nos. 119, 120). Barnes requested, and the Court conducted, an evidentiary hearing on the objections. (ECF No. 128). The objections are now fully briefed (ECF Nos. 137, 144, 146, and 147) and are ripe for determination.

**DISCUSSION**

The Final PSR assessed Barnes a base offense level of 32 after determining that, including relevant conduct, Barnes was responsible for at least 150 grams but less than 500 grams of actual methamphetamine. (Final PSR ¶ 70). The officer then increased that offense

---
[1] This motion remains under advisement and will be addressed at sentencing. (ECF No. 102).

level by two levels because Barnes possessed a dangerous weapon (PSR ¶ 71) and applied a two-level enhancement under U.S.S.G. §3B1.1(c) because the defendant was an organizer, leader, manager, or supervisor over Neal (PSR ¶ 71). After application of enhancements, Barnes' adjusted offense level was 36. Barnes then received a two-level reduction for acceptance of responsibility, U.S.S.G. §3E1.1(a), and an additional one level under U.S.S.G. §3E1.1(b) because Barnes assisted authorities in the investigation or prosecution of his own misconduct. (Final PSR ¶¶ 77, 78). All this yielded a total offense level of 33. With Barnes' criminal history category of I, he faces a guidelines range of 135 to 168 months with a statutory mandatory minimum term of ten years imprisonment.

As noted, Barnes objection relates mainly to the two-level enhancement for his role in the offense. He maintains that without application of that enhancement, he is eligible for "safety valve" consideration, that is, a reduction in the minimum penalty and imposition of a sentence below the statutory mandatory minimum. After a review of the facts in the PSR and testimony elicited at the evidentiary hearing, the Court will address the parties' arguments.

A.     **Factual Background**

During their investigation of another drug conspiracy, which resulted in the arrest and indictment of several individuals, ATF Special Agent Skender (SA Skender) and DEA Special Agent Schneider (SA Schneider) learned from a confidential source (CS) that Patterson was taking over the distribution of methamphetamine for one of the indicted individuals. (Final PSR, ¶8). In September 2020, SA Skender utilized the CS to purchase 63 grams of methamphetamine. Although the deal was coordinated between Patterson and the CS, Barnes delivered the methamphetamine to the CS. (*Id.* ¶¶ 9-15). More controlled buys followed in February, September, October, and December 2021. In each of these controlled buys, the CS arranged the

purchase through Barnes but Neal either made the delivery to the CS (February, September, December) or was present in the car with Barnes (October) during the delivery to the CS.

After Neal made the September 29, 2021, controlled buy delivery, surveillance observed Barnes and Neal meet inside a Dunham Sporting Goods store. The CS then texted Barnes telling him he was in the market to purchase a firearm. On September 30, 2021, Barnes met with the CS and sold the CS a Taurus pistol and ammunition. At this transaction, the two also discussed the next methamphetamine purchase with Barnes telling the CS that if the CS purchased 5 ounces, Barnes could sell it for $2,500 and ensure its quality.

During the October 2021 controlled buy, the CS purchased the 5 ounces previously discussed from Barnes. Barnes (driving) and Neal (passenger) arrived at the buy location and provided the CS the methamphetamine. A portion of the audio recording of this controlled buy was played at the evidentiary hearing and submitted to the Court. (Dfdt. Ex. D). The CS entered the vehicle and commented that it smelled good in the car because it smelled like weed. Neal responded, "You smoke weed? Get my number in there, we can blow (inaudible). Let me know when you are ready." Barnes then chimes in "if you want some weed, I be having weed. I know someone to get it from." (*Id.* 10/18/21 transaction). As the CS exited the vehicle, Neal gave the CS his phone number and the CS exited the vehicle.

In December 2021, the CS arranged the purchase of methamphetamine and a firearm. Barnes told the CS that his "bro" had a Taurus G2 for sale and asked the CS if he wanted it for $350. The CS struck a deal with Barnes to purchase 3 ounces of methamphetamine and the pistol for $2,050 but that deal later changed to 2 ounces of methamphetamine and the pistol for $1,500. Neal delivered both the methamphetamine and the firearm.

The final interaction between the CS and Barnes occurred in February 2022. As with all the other controlled buys, the CS arranged the purchase with Barnes. The CS also inquired about acquiring another pistol and provided a $2,500 "budget" for both the drugs and the firearm. Barnes sent photos of two firearms to the CS for the CS to pick from. The two agreed to $1,750 for the pistol and 2 ounces of methamphetamine. Again, Neal arrived at the meet location and provided the methamphetamine to the CS. Neal did not deliver the firearm because Barnes was unable to secure the firearm in time for the deal. On March 23, 2022, a grand jury returned an indictment against Barnes, Neal, and Patterson.

Neal, in accordance with the cooperation provision in his plea agreement, testified at the evidentiary hearing. (Evid. Hr'g Tr., ECF No. 136). Neal testified that he has known Barnes for well over a decade. (Hr'g Tr., 8-9). The two went to high school together and Neal worked at Barnes' lawn care company. (*Id.*). Neal was also employed as a package handler at FedEx. (*Id.* 31).

In 2020 and 2021, Neal was using marijuana and purchased it from Barnes and others. (Hr'g Tr., 10). Neal was buying daily either from Barnes or his other suppliers. In Neal's words "I would smoke a lot." (*Id.*). Neal testified that he would make deliveries for Barnes in exchange for "a couple zips"[2] of marijuana. (*Id.* 10-11). Neal personally used the marijuana he received by making deliveries for Barnes. Neal estimated that he made 6-8 deliveries for Barnes, although the Government states that Neal only made deliveries to the CS and no one else.

Neal described the process for how the deliveries would occur. He would receive a text from Barnes after Barnes negotiated the deal. Neal would arrange to meet him to obtain the drugs. (Hr'g Tr., 11-12). Neal always obtained the drugs from Barnes and they would be packaged in a bag. (*Id.* 17). Neal never opened the bag but he "knew it was something bad."

---

[2] In street terminology, a "zip" is 28 ounces.

(*Id.*). He would then deliver the drugs on Barnes' behalf to the designated location and designated time. According to Neal, he never spoke to the buyer/CS to arrange the deals and Barnes was the individual who set the location for the delivery. (*Id.* 15). Neal admitted delivering drugs to the CS on his own in September and October 2021 and February 2022. At other times he made the deliveries with Barnes.

After being shown photographs from the February 2021 controlled buy, Neal identified himself and Barnes as well as Barnes' vehicle, a 2013 Dodge Charger. Neal testified that he co-signed a loan for the Charger for Barnes because Neal had "decent credit." (Hr'g Tr., 14). Neal testified that he never drove that vehicle. (*Id.*). He also testified that he did not have a license and has never had a license. On cross-examination, Neal conceded that Barnes' name was not on the retail installment contract for the Charger and that the Charger was registered to Neal at an address previously associated with him. (*Id.* 33-34).

Neal testified that after he made a delivery in September 2021, he met with Barnes at Dunham's Sporting Goods so he could purchase a gun for Barnes to sell to the CS. (Hr'g Tr., 16). Neal stated that because he didn't have a criminal record, it was easy for him to get a gun. (*Id.* 17). Neal did not end up purchasing a gun. On a second occasion after Barnes had been arrested, Neal went to Rural King to purchase a gun for Barnes. Neal learned that Barnes' residence had been raided but still went to Rural King as he and Barnes had agreed to this a few days earlier. Neal did not buy a gun that day either.

Neal acknowledged giving the CS his phone number on two occasions and he recalled that the CS inquired about purchasing "feti" from Neal. During direct examination, Neal testified that he recalled giving the CS the impression that he could supply the CS with fentanyl, but he did not sell her "feti" and said it to "pull her chain." On cross-examination, Neal identified this

5

exchange on an audio recording and said his "homey at work" could get "feti" (Hr'g. Tr. 40). When pressed on what he meant or who he was referring to, Neal testified "nobody" and "I just said it." (*Id.*). Neal was adamant, however, that he had no intention of selling fentanyl to the CS and that he never sold any drugs on his own to the CS.

Based on these facts, the probation officer determined that Barnes was an organizer, leader, manager, or supervisor in the criminal activity and assessed a two-level increase in his offense level.

### B. Analysis

#### 1. Role in the Offense

Section 3B1.1 of the Sentencing Guidelines provides for up to a four-level increase in the offense level for a defendant's aggravated role in the offense. A defendant's offense level is increased by four levels if he is an "organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive" and by three levels if he was a "manager or supervisor" of the same. U.S.S.G. § 3B1.1(a)–(b). Relevant here, a defendant who is an organizer, leader, manager, or supervisor "in any criminal activity other than described in (a) or (b)" is increased by two levels. §3B1.1(c). The probation officer determined that the two-level increase was warranted because Barnes supervised Neal's activities in the conspiracy.

"The determination of a defendant's role in the offense is to be made on the basis of all conduct within the scope of §1B1.3 (Relevant Conduct)." USSG §3B1.1, comment. (intro. commentary). The Guidelines do not explicitly define the terms "organizer," "leader," "manager," or "supervisor," but the accompanying commentary offers a list of factors that courts can use to distinguish between the organizer or leader roles and the manager or supervisor roles. These factors include the exercise of decision-making authority, the nature of participation in the

6

offense, the recruitment of accomplices, a claimed right to a greater share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the offense, and the degree of control exercised over others. § 3B1.1 n.4. Ultimately, in applying the enhancement, the court must conduct a practical inquiry and make a "commonsense judgment about the defendant's relative culpability given his status in the criminal hierarchy." *United States v. House*, 883 F.3d 720, 724 (7th Cir. 2018), quoting *United States v. Dade*, 787 F.3d 1165, 1167 (7th Cir. 2015). The government bears the burden of demonstrating, by a preponderance of the evidence, that the enhancement applies. *United States v. Cortina,* 733 F.Supp. 1195, 1199 (N.D.Ill.1990).

Barnes takes a two-sided approach to attacking the enhancement. First, he argues that the facts in the PSR do not establish by a preponderance of the evidence that Barnes supervised Neal's activities. Second, he argues that Neal's testimony is so unreliable and incredible that it cannot be credited to meet the Government's burden. While the Court agrees in principle that there are some record inconsistencies and Neal's testimony is, at times prickly, the record, as a whole, supports the conclusion that Barnes supervised Neal's criminal activity.

Beginning with the events contained in the PSR, Barnes concedes that he communicated with the CS and that he was distributing controlled substances to the CS. As Barnes points out, there exist communications in the record showing his involvement with the CS and so there is no question that he was involved in the distribution of controlled substance. What is absent, he contends, are similar communications between he and Neal reflecting their interactions and thus, there is no way to independently corroborate Neal's testimony that Barnes was directing his activities.

7

But this argument ignores the evidence that is in the record and begs the question of how Neal would know the who, what, where, and when for the deliveries that were indisputably made. Neal testified that Barnes recruited him to make deliveries for him in exchange for marijuana. After Barnes talked to the CS, he contacted Neal, gave Neal a meeting spot to obtain the drugs, gave him the location of the delivery, and told him to deliver the drugs to the CS. Barnes provides no plausible explanation to refute Neal's testimony that this is what occurred or how Neal would have otherwise been provided this information. Barnes makes much of the discrepancies in Neal's testimony from his proffer to the agents, but none of these discrepancies undercut his testimony on these key points. Moreover, Barnes clearly negotiated the transactions, set the pricing, and obtained the drugs and firearms that he provided to Neal for delivery.

The Court acknowledges that on cross-examination, Barnes' counsel elicited some discrepancies in Neal's testimony, none of which the Court finds particularly probing. Neal, who the Government aptly labels "unsophisticated," testified that he co-signed a loan for Barnes. On cross-examination, Neal, seemingly confused, admitted the retail installment contract in evidence which showed only one signature on the loan documents. He also appeared legitimately confused on the vehicle's registration and the fact that he had been sued by the lender for default. Similarly, Neal testified that he knew whatever he was delivering was "bad", but he said repeatedly that he did not look into the bags he received from Barnes. Again, on cross-examination, defense counsel effectively called into question whether a few ounces of drugs and a handgun weighed the same and the reasonableness of Neal's beliefs about what was in the deliveries. Of course, the point of questioning these details by defense counsel is to demonstrate that if Neal lied or misrepresented the less relevant facts, he is not credible about the facts that

8

matter. But even if the Court could find fault with some of the testimony, the Court cannot when it comes to the particular role Neal played in Barnes' enterprise.

Neal's testimony never wavered on his role in delivering drugs for Barnes in exchange for marijuana. In fact, Neal unabashedly told the Court he smoked weed "a lot" and was purchasing marijuana daily from Barnes prior to starting deliveries for him. The fact that Barnes had a weed source was evident from Barnes himself; in the audio recording of one of the controlled buys, Barnes told the CS that he "knew someone to get it from." And, when law enforcement executed the search warrant at Barnes' residence, they found methamphetamine and marijuana packaged for distribution. (Gov't Ex. 22). This evidence makes it more likely that Neal agreed to deliver drugs for Barnes to feed his marijuana addiction.[3]

Nevertheless, Barnes asserts that the record, at most, reflects that Barnes and Neal were "equal partners." But where is the evidence of this? Barnes contends that the evidence is in Neal's statements during the deliveries. For instance, Barnes points out that in the video recording of the February 8, 2021 delivery, Neal went to the CS' vehicle and when asked by the CS if the price would go down if the CS bought more, Neal responded, "I'll work with you" and told her to "hit him up." (Ex. D. 2/08/21 transaction). That Neal did not tell the CS, "I have to talk to Barnes first" is evidence, Barnes says, that Neal was an equal partner. Tit for tat, the Government notes that Barnes never told the CS during any of their communications arranging

---

[3] Neal admitted on cross-examination that he gave the CS his cell number on a few occasions. Defense counsel, in turn, attempted to establish during cross that Neal did this because he wanted to deal drugs to the CS. Counsel points to the exchange where the CS asked him if he could get "fety" and Neal responded that his "homey at work" could get "fety." Neal testified that he said it to "pull her chain" and that he "just said it" but had no intention of following up with the CS about it. The Court agrees that Neal's response to the CS was odd but, in the Court's observation, Neal was engaging in the drug trafficking equivalent of "puffery." The Court finds credible, after observing Neal, the notion that Neal made statements to the CS without any intention of supplying the CS with fentanyl.

the deals that he had a partner or that his partner would be delivering the drugs and/or firearms. So the Court is left with, at best, competing evidence of what didn't happen. That is not helpful.

In short, after observing Neal's demeanor and testimony the Court finds that Neal testified credibly about his role in the criminal conspiracy. Collectively and using commonsense, the evidence supports a finding by a preponderance of the evidence that Barnes supervised Neal's activities. Barnes arranged the deals and then contacted Neal. Barnes set the meeting spot for Neal to pick up the drugs from him and told Neal the delivery location and time. Although "some hierarchy among those involved in the criminal activity must exist" for the enhancement to apply, *United States v. Weaver*, 716 F.3d 439, 444 (7th Cir. 2013), the Government need not show that Defendant was "ordering around" another participant to establish this hierarchy. Instead, it is sufficient that Defendant was "[o]rchestrating or coordinating activities performed by others," *United States v. Martinez*, 520 F.3d 749, 752 (7th Cir. 2008), or "delegat[ing] delivery or payment tasks" in connection with drug transactions. *United States v. Sainz-Preciado*, 566 F.3d 708, 714 (7th Cir. 2009). The Court finds that the Government has met its burden here.

Application of the enhancement under the facts here also comports with the purpose of § 3B1.1, that is to assign punishment to defendants based upon their relative degree of responsibility for the "offense." If it is determined that a defendant had no greater role than any other participant, he cannot receive a § 3B1.1 increase. *United States v. Gracia*, 272 F.3d 866, 876 (7th Cir. 2001). But here, the record shows that Barnes had a greater degree of responsibility than Neal, and, in turn, he had greater relative responsibility in the "offense" as contemplated by § 3B1.1. The application of the enhancement is entirely consistent with § 3B1.1's overarching purpose.

The Government has sustained its burden and the two-level enhancement under U.S.S.G. §3B1.1(c) is appropriate. The Defendant's objection is OVERRULED.

### 2. *Safety Valve*

Defendant also argues that he may be eligible for safety valve relief under 18 U.S.C. §3553(f). The Sentencing Guidelines incorporate the safety valve and state that a defendant who satisfies all five safety-valve criteria is entitled to a two-level reduction to their offense level. U.S.S.G. §§ 5C1.2, 2D1.1(b)(18). Here, because the Court finds that Defendant supervised others in the offense, he is disqualified from safety valve relief. See §5C1.2(a)(4) (setting forth criteria that "defendant was not an organizer, leader, manager, or supervisor of other in the offense…").

## CONCLUSION

Based on the above, the Defendant's objections to the PSR (ECF No. 117) are OVERRULED. The Court will set the matter for a sentencing hearing by separate entry.

SO ORDERED on May 10, 2024.

                                      s/ *Holly A. Brady*
                                      CHIEF JUDGE HOLLY A. BRADY
                                      UNITED STATES DISTRICT COURT